## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAVEEN BHATT and PORTIA MARIE SMITHSON, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| | JURY DEMAND |
| v. | |
| CHRISTIAN DIOR, INC. and CHRISTIAN DIOR COUTURE SAS, | |
| Defendants. | |

Plaintiffs Raveen Bhatt and Portia Marie Smithson ("Plaintiffs"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to them and upon information and belief as to all other matters, and by and through undersigned counsel, hereby bring this Class Action Complaint against Defendants Christian Dior, Inc. and Christian Dior Couture SAS (collectively "Dior" or "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves, and all other individuals similarly situated ("Class Members") against Dior for its failure to secure and safeguard the personally identifiable information ("PII") of Plaintiffs and Class Members.

2.    Dior is a for-profit corporation organized under the state laws of New York and maintains its corporate offices and principal place of business in New York, New York. In the regular course of its business, Dior is required to maintain reasonable and adequate security measures to secure, protect, and safeguard their customers' PII against unauthorized access and

disclosure.

3.      On or about May 7, 2025, Dior became aware that an unauthorized third party gained access to Dior's information technology systems and accessed information containing PII of Dior's customers.

4.      Dior owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Dior breached that duty by, among other things, failing to, or contracting with companies that failed to, implement and maintain reasonable security procedures and practices to protect patients' PII from unauthorized access and disclosure. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite the dire warnings about the severe impact of data breaches on Americans of all economic strata, companies still fail to make the necessary investments to implement important and adequate security measures to protect their customers' and employees' data.

5.      Dior required its customers to provide it with sensitive PII and failed to protect it. Dior had an obligation to secure customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between Dior and Plaintiffs and Class Members.

6.      As a result of Dior's failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiffs and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiffs and the Class as they no longer have control over their PII, which PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity

theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7.      Plaintiffs and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8.      Plaintiffs bring this action on behalf of themself and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring Dior to ensure that it implements and maintains reasonable data security practices going forward.

## II.      THE PARTIES

9.      Plaintiff Raveen Bhatt is a resident of Chicago, Illinois, whose Personal Information was compromised in the Data Breach.

10.     Plaintiff Portia Marie Smithson is a resident of Pittsburgh, Pennsylvania, whose Personal Information was compromised in the Data Breach.

11.     Defendant Christian Dior Inc. is an New York corporation, with its headquarters and principal place of business located at 712 5th Avenue, New York, New York 10019.

12.     Defendant Christian Dior Couture SAS is a corporation with its principal place of business in France.

## III.      JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d) because there are more than 100 Class Members, at least one class member, including Plaintiffs, is a citizen of a state different from that of Dior, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

14.     This Court has personal jurisdiction over Defendants through Defendant Christian

Dior, Inc.'s business operations in this District. Defendant Christian Dior, Inc. also maintains its principal place of business in New York.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Christian Dior Inc.'s principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' and Class Members claims occurred in this District.

## IV.    GENERAL ALLEGATIONS COMMON TO ALL COUNTS

16.     This is a class action brought by Plaintiffs, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Dior's willful and reckless violations of their privacy rights. Plaintiffs and the other Class Members were customers that contracted with Dior.

17.     On or about January 26, 2025, an unauthorized third party accessed and downloaded Plaintiffs' and the Class Members' PII.

18.     This action pertains to Dior's unauthorized disclosures of the Plaintiffs' PII that occurred on or about January 26, 2025 (the "Breach").

19.     Dior disclosed Plaintiffs' and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of Dior's failure to safeguard and protect their PII.

20.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Dior assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

21.     Despite recognizing its duty to do so, Dior failed to implement security safeguards to protect Plaintiffs' and the Class Members' PII.

22.     Plaintiffs and Class Members have taken reasonable steps to maintain the

confidentiality of their PII and relied on businesses, such as Dior, to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

### 1.    The Data Breach

23.    On July 18, 2025, Dior reported that its network systems were accessed by an unauthorized third party. The unauthorized access occurred on or around January 26, 2025, and resulted in the exposure of certain data.

24.    This data includes what appears to be customer files. According to Dior's Notice regarding the Data Breach, the exposed documents may have contained highly sensitive personal information such as first and last names, contact information, addresses, dates of birth, Social Security numbers, Passport numbers, and Government ID numbers.  This type of information can be exploited by malicious actors for identity theft or other unlawful purposes.

### 2.    The Data Breach was Preventable

25.    Had Dior maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Dior could have safeguarded customer data. Dior's lack of security controls and implementation of enhanced security measures only after the Data Breach are inexcusable.

26.    Dior was at all times fully aware of its obligation to protect customers' PII and the risks associated with failing to do so. Dior knew that information of the type collected, maintained, and stored by Dior is highly coveted and a frequent target of hackers.

27.    This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:

28.     By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

29.     Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

30.     When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

31.     In April 2023, NationsBenefits, "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attached targeting Fortra's Anywhere platform, a file-transfer software that the firm was using. According to the news reports,

---

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), *available at* https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020), *available at:* https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last accessed June 20, 2025).

the ransomeware gang CLOP claimed responsibility for the attack, saying it took advantage of a previously known vulnerability."[3]

32.    In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

33.    In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million patients was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing patient personal information."[5]

34.    In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

35.    In September 2020, the United States Cybersecurity and Infrastructure Security

---

[3] Mark Rosanes, *The insurance industry cyber crime report:  recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023), *available at* https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx (last visited June 20, 2025).
[4] *Id.*
[5] *Id.*
[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), *available at* https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited June 20, 2025).

Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

36.     Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

37.     The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a solen credit or debit card

---

[7]  Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), *available at* https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf, (last visited June 20, 2025).

[8]  *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), *available at* https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (Last visited June 20, 2025).

[9]  Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 20, 2025).

number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[11]

38.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[12]

39.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

40.     Even then, a new Social Security number may not be effective. According to July Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the

---

[10]  Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2 (last visited July 28, 2021).
[11] *In the Dark*, VPNOVERVIEW (2019), *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 20, 2025).
[12] *Identity Theft and Your Social Security Number* (Oct. 2024), SOCIAL SECURITY ADMINISTRATION,  *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 20, 2025).

new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

41.    Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

42.    The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[14]

43.    Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

44.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

---

[13] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 20, 2025).
[14] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), *available at* https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 20, 2025).

45.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

46.    Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

47.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[15] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will fact, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[16]

48.    The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

### 3.    Dior Failed to Comply with the Federal Trade Commission

49.    Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial

---

[15] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last visited June 20, 2025).

[16] *Id.*

institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[17]

50.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principals for business.[18] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted form the system; and have a response plan ready in the event of a breach.[19]

51.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

52.     Highlighting the importance of protecting against phishing and other types of data

---

[17] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited June 20, 2025).

[18] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016), *available at* https://www.cliclaw.com/library/us-federal-laws/data-security/ftc-released-guide-protecting-personal-information-guide#:~:text=Protecting%20Personal%20Information%3A%20A%20Guide%20for%20Business%20October,card%20details%20to%20prevent%20fraud%20and%20identity%20theft (last visited June 20, 2025).

[19] *Id.*

[20] FEDERAL TRADE COMMISSION, *Start With Security*, *supra* footnote 17.

breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

### 4.    The Impact of Data Breach on Victims

53.    Dior's failure to keep Plaintiffs' and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and contact information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

54.    The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Tax documents, especially W-2s and 1040s, are particularly valuable on the dark web due to their potential to enable a wide range of financial crimes.[21]  Identity thieves can use the PII to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds,

---

[21] Brittany De Lea, *Here's how much your tax info is worth on the dark web*, FOX BUSINESS (April 12, 2019), *available at* https://www.foxbusiness.com/personal-finance/tax-info-dark-web (last visited June 20, 2025).

such as obtaining a job, procuring housing, or giving false information to police during an arrest.

55.     Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

56.     Given the exfiltration of PII from Dior, many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

57.     It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;

- 76% felt violated;

- 32% experienced financial related identity problems;

- 83% reported being turned down for credit or loans;

- 32% reported problems with family members as a result of the breach;

- 10% reported feeling suicidal.[22]

---

[22] *2021 Consumer Aftermath Report:  How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RESOURCE CENTER (May 2021), *available at* https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf (last visited June 8, 2025).

58.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;

- 37.1% reported an inability to concentrate/lack of focus;

- 28.7% reported they were unable to go to work because of physical symptoms;

- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[23]

59.     Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts…individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

60.     The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent

---

[23] *Id.*

value to its owner, which has been recognized by courts as an independent form of harm.[24]

61.    Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

62.    As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.    The unconsented disclosure of confidential information to a third party;

b.    Unauthorized use of their PII without compensation;

c.    Losing the value of the explicit and implicit promises of data security;

d.    Losing the value of access to their PII permitted by Dior without their permission;

e.    Identity theft and fraud resulting from the theft of their PII;

f.    Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g.    Anxiety, emotional distress, and loss of privacy;

h.    The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i.    Unauthorized charges and loss of use of and access to their accounts;

---

[24] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

j.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

k.  Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l.  The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

63.  Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[25]

64.  Plaintiffs and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[26]

65.  Plaintiffs and Class Members have a direct interest in Dior's promises and duties to

---

[25] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited June 20, 2025).

[26]  Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), *available at* https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited June 20, 2025).

protect PII, i.e., that Dior would *not increase* their risk of identity theft and fraud. Because Dior failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Dior's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for Dior's wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PII.

66.    Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII permitted through Dior's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by. Another does not diminish the rights- holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

67.    Plaintiffs and Class Members have an interest in ensuring their PII is secured and not

subject to further theft because Dior continues to hold their PII.

## V.    CLASS ACTION ALLEGATIONS

68.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed nationwide class (herein "the Class"), defined as follows:

**Nationwide Class**
All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

69.    Excluded from the proposed Class are any officer or director of Dior; any officer or director of any affiliate, parent, or subsidiary of Dior, or anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

70.    **Numerosity.** Members of the proposed Class are likely to number in the tens of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from Dior's own records.

71.    **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

    a.    Whether Dior engaged in the wrongful conduct alleged herein;

    b.    Whether Dior's inadequate data security measures was a cause of the Data Breach;

    c.    Whether Dior owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

    d.    Whether Dior negligently or recklessly breached legal duties owed to Plaintiffs and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

    e.    Whether Plaintiffs and the Class are at an increased risk for identity theft because of the Data Breach;

f.  Whether Dior failed to implement and maintain reasonable security procedures and practices for Plaintiffs' and Class Members' PII in violation of Section 5 of the FTC Act;

g.  Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

72.  Dior engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous questions that dominate this action.

73.  **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Dior's misconduct affected all Class Members in the same manner.

74.  **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

75.  **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Dior, making it impracticable for Class Members to individually seek redress for Dior's wrongful

conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
## BREACH OF CONTRACT

76.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

77.    Plaintiffs bring this claim individually and on behalf of the Class.

78.    Plaintiffs and the Class Members paid money to Dior and provided Dior with the PII of Plaintiffs and the Class Members. In exchange, Dior agreed to, among other things: (1) provide services relating to Plaintiffs and Class Members; (2) use Plaintiffs' and Class Members' PII to facilitate providing services involving Plaintiffs and Class Members; (3) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII; and (4) protect Plaintiffs' and Class Members' PII in compliance with federal and state laws and regulations, industry standards, and Dior's representations regarding its security and privacy practices

79.    The protection of PII was a material term of the contracts between the Plaintiffs and Class Members and Dior. Had Plaintiffs and Class Members known that Dior would not adequately protect their PII, they would not have paid for or obtained services with Dior.

80.    Dior breached its obligations under the contracts with Plaintiffs and the Class Members by failing to implement and maintain reasonable security measures to protect and secure Plaintiffs' and the Class Members' PII, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class Members' PII in a manner that complies with

applicable laws, regulations, and industry standards.

81.    Dior's breach of its obligations with Plaintiffs and Class Members directly resulted in the Data Breach and the resulting injuries to Plaintiffs and Class Members.

82.    Plaintiffs and all other Class Members were damaged by Dior's breach of contract because: (i) they now face a substantially increased and imminent risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) their PII was improperly disclosed to unauthorized individuals; (iii) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (v) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT II
## NEGLIGENCE

83.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

84.    Plaintiffs bring this claim individually and on behalf of the Class.

85.    Dior owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiffs' and Class Members' PII in Dior's possession was adequately secured and protected.

86.    Dior owed, and continues to owe, a duty to Plaintiffs and the other Class Members to safeguard and protect their PII.

87.    Dior breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiffs' and the other Class Members' PII.

88.    It was reasonably foreseeable that Dior's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PII would result in an unauthorized third-party gaining access to such information for no lawful purpose.

89.    As a direct result of Dior's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the members of the Class confidential information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

90.    By engaging in the negligent acts and omissions alleged herein, which permitted an unknown third party to access Dior's systems containing the PII at issue, Dior failed to meet the data security standards set forth under Section 5 of the FTC Act, which prohibits "unfair…practices in or affecting commerce." This prohibition includes failing to have adequate data security measures, which Dior has failed to do as discussed herein.

91.    Dior's failure to meet this standard of data security established under Section 5 of the FTC Act is evidence of negligence.

92.    Neither Plaintiffs nor other Class Members contributed to the Data Breach as described in this Complaint.

93.    Dior's wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) negligence at common law.

94.    As a result of Dior's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and

imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Dior's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**

95.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

96.    Plaintiffs bring this claim individually and on behalf of the Class.

97.    Plaintiffs and Class Members gave Dior their PII in confidence, believing that Dior would protect that information. Plaintiffs and Class Members would not have provided their PII had they known it would not be adequately protected. Dior's acceptance, use, and storage of Plaintiffs' and Class Members' PII created a fiduciary relationship between Dior and Plaintiffs and Class Members. In light of this relationship, Dior must act primarily for the benefit of Plaintiffs and the Class Members, which includes safeguarding and protecting Plaintiffs' and Class Members' PII.

98.    Dior has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship. It breached that duty by, among other things, failing to, or contracting with third parties that failed to, properly protect the integrity of the system containing Plaintiffs' and Class Members' PII, and otherwise failing to safeguard Plaintiffs' and Class Members' PII that it collected, utilized, and maintained.

99.    As a direct and proximate result of Dior's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a

substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Dior's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## UNJUST ENRICHMENT

100.    Plaintiffs reallege paragraphs 1 through 75 as if fully set forth herein.

101.    This claim is pleaded in the alternative to the breach of contract claim.

102.    Plaintiffs bring this claim individually and on behalf of the Class.

103.    Plaintiffs and Class Members conferred a monetary benefit upon Dior in the form of PII that was transferred to Dior.

104.    Dior accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Dior benefitted from the receipt of Plaintiffs' and Class Members' PII, as this was used to facilitate services and other aspects of Dior's business to Plaintiffs and the Class Members.

105.    As a result of Dior's conduct, Plaintiffs and Class Members suffered actual damages.

106.    Dior should not be permitted to retain funds paid to it for services related to the PII of Plaintiffs and the Class Members given that Dior failed to adequately implement the data privacy and security procedures that would have safeguarded the PII of Plaintiffs and Class Members.

107.    Dior should be compelled to provide for the benefit of Plaintiffs and Class Members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Petition, respectfully request that the Court enter judgment in their favor and against Dior, as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Lead Counsel for the Class;

B.    Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Dior from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiffs and the Class such other favorable relief as allowable under law.


Dated: July 28, 2025

Respectfully submitted,

**SULTZER & LIPARI, PLLC**
By: /s/ Jason P. Sultzer_____
Jason P. Sultzer, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747

sultzerj@thesultzerlawgroup.com

*Attorneys for Plaintiffs*